IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| CHARLES DANIEL SMITH,<br><br>Plaintiff,<br><br>vs.<br><br>CHARTER COMMUNICATIONS, INC.,<br><br>Defendant. | CV 18-69-BLG-SPW-TJC<br><br><br>**FINDINGS AND RECOMMENDATIONS OF U.S. MAGISTRATE JUDGE** |

Plaintiff Charles Daniel Smith ("Smith") filed this action against Defendant Charter Communications, Inc. ("Charter"), arising out of Charter's termination of Smith's employment. (Doc. 6.) Smith asserts a claim for wrongful discharge from employment under Montana's Wrongful Discharge from Employment Act, §§ 39-2-901 *et seq.* (*Id.* at 2.)

Before the Court is Charter's Motion for Summary Judgment. (Doc. 39.) Smith filed a response brief and Charter replied. (Docs. 43 & 46.) This matter is fully briefed and ripe for the Court's review. Having considered the parties' submissions and for the foregoing reasons, the Court recommends Charter's Motion for Summary Judgment be GRANTED in part and DENIED in part.

I.     **Factual Background**[1]

In 2012, Smith was employed by Cablevision Systems Corporation as the regional vice president of network management.  (Doc. 44 at ¶ 1.)  Charter acquired Cablevision in July 2013, and as a result Smith became Charter's employee.  (*Id.* at ¶ 2.)  Smith was vice president of Video Operations starting in July 2014, responsible for "the entire video operation of Charter."  (*Id.* at ¶¶ 4-6.)  In May 2015, the department split, and Smith became vice president of Sustained Video Operations.  (*Id.*)

Smith's 2014 Performance Management Plan, an annual evaluation process rating 10 key effectiveness areas, assigned Smith an overall rating of 3.2 or "Achieved Expected Performance."  (Doc. 41-3 at 5.)  Smith received two top scores of 4, or Exceeded Expected Performance, in the areas of Job Knowledge and Communicates Effectively; and one lower score of 2, or Partially Achieved Expected Performance, in one area: Develops Relationships.  (*Id.* at 2.)  For the seven remaining categories, Smith received a score of 3, or Achieved Expected Performance.  (*Id.* at 3-6.)  The evaluation was conducted by Smith's manager, Charlotte Field, and was issued on October 6, 2015.  (*Id.*)

---

[1] The background facts set forth here are relevant to the Court's determination of the pending motion for summary judgment; are taken from the parties' submissions; and are undisputed unless otherwise indicated.

On October 8, 2015, two days after the 2014 evaluation was issued, Ms. Field issued a corrective action report, or written warning, identifying concerns regarding the effectiveness of Smith's leadership; a failure to implement metrics to assess team performance; project completion; and effective communication.  (Doc. 44 at ¶ 8.)

Smith's peers also conducted a "360 Review" of him about this same time, in which anonymous feedback on his performance was given.  (*Id.* at ¶ 9.)  While the parties dispute the admissibility of the peer review, given the anonymity of the evaluations, Smith received positive reviews as well as criticisms.  (*Id.* at ¶¶ 10-11.)

In May 2016, Smith changed positions to vice president of ISP (Inside Plant), responsible for the Mountain States management area, which included Montana, Wyoming, and portions of Colorado.  (*Id.* at ¶ 12; Doc. 12 at ¶ 4.)  Smith's day-to-day responsibilities appear to be disputed on some level, with Smith maintaining he worked on ISP initiatives, as well as presented budgets and technical projects to his supervisors.  (Doc. 44 at ¶ 15.)  Charter, on the other hand, states that Smith's responsibilities included deploying technology, avoiding outages, and  "meet[ing] and motivate[ing] your people" (alteration original), which Charter alleges was a particularly important aspect because "people didn't know each other" following Charter's merger with Cablevision.  (*Id.)*  The position

3

required some level of travel, but the parties dispute the amount and the underlying

reasons why travel was important.  (*Id.* at ¶¶ 16-18.)

Smith was again evaluated for performance in 2016 by his new manager

Gary Heimstead.  (*Id.* at ¶ 18.)  Nine key effectiveness areas and behaviors were

rated, with a manager calculated overall rating of 3.3, or Achieved Expected

Performance.  (Doc. 41-10 at 7.)  Smith received a top rating of 4, or Exceeded

Expected Performance, in three categories, with the remaining six categories rated

3, or Achieved Expected Performance.  (*See* Doc. 41-10.)  The evaluation also

included "top three areas for development," which included improving the sense of

urgency within the management area, at all levels; insuring proper documentation

of network and network services; and spending more time in the field and meeting

face to face with people working for and with him.  (*Id.* at 7.)

Shortly after the 2016 performance review, Heimstead issued Smith a

corrective action notice around April 6, 2017, listing four deficiencies: "[f]ailing to

insure ISP response is immediate on several occasions and causing a delay in

service restoration; [f]ailing to insure ISP sparing (tools) were available on sites

where OSP is a first responder; [f]ailure to insure proper testing of ALL RF (radio

frequency) paths as a method of trouble shooting; and [n]ot following up on issues

arising from processes used for notification and escalation of events."  (Doc. 44 at

¶ 13.)  Smith admits receiving the corrective action notice and proffers his rebuttal

email and attachments to Heimstead.  (Docs. 43 at 13, 31-32; 44-3 at 1.)  Smith

eventually resolved the issues without further disciplinary action.  (Doc. 44-6 at

11-12.)

In July 2017, Smith took time off for a mission with his church to Honduras

to help disabled and disadvantaged children and mothers in La Paz.  (Doc. 44-4 at

45-46.)  The trip was intended to be for two weeks, but Smith was injured and

required 10 days of hospitalization in Honduras.  (*Id.*)  After a life flight to Miami,

Smith spent another 14 days in the hospital.  (*Id.* at 45.)  The extended time away

from work was classified as FMLA leave until November 2017, when Smith

returned to work.  (*Id.* at 46-47.)

During Smith's recovery, in October 2017, Smith posted a comment on

Facebook from his private account, which read: "Cut the Helena fat and stop

playing games Governor.  No program is going to make little disabled kids more

intelligent.  Cut the feel good nonsense and govern."  (Doc. 44 at ¶ 24.)  Another

Facebook participant took a screenshot of the post and shared it.  (*Id.*)  The shared

post received public attention, resulting in complaints and media directed at

Charter.  (*Id.* at ¶ 25.)  Smith felt the shared post was taken out of context but

deleted his post at Charter's request.  (*Id.* at ¶¶ 24, 26, 27; Doc. 41-16.)  The

parties dispute whether Smith violated Charter's social media policy or code of

conduct.  (Doc. 44 at ¶¶ 27-28.)  Charter's Human Resources Senior Manager

Stephanie Gainous attests that Smith was suspended for two weeks without pay and given a final written warning in lieu of termination.  (Doc. 41-35 at 3, ¶ 7.) Smith disputes that termination was on the table because his right to free speech was implicated.  (Doc. 44 at ¶ 29.)

Smith returned to work on November 20, 2017 but was terminated on January 29, 2018.  (*Id.* at ¶¶ 30, 49.)  A corrective action report itemized two reasons for termination: (1) "knowingly allowing Duan Auge to continue performing as a management Area Critical Infrastructure Engineer after his position was changed to an ISP II Engineer"; and (2) "[i]n December 2017, you failed to fulfill the 50% travel requirement to your management area."  (Doc. 41-25 at 1.)

Smith filed the instant action stating a claim for wrongful discharge in the Montana Thirteenth Judicial Court in Yellowstone County in March 2018.  (Doc. 1.)  Charter removed the action to this Court in April 2018.  (*Id.*)  Charter now moves for summary judgment.  (Doc. 39.)

## II.    Legal Standards

### A.    Summary Judgment

A court will grant summary judgment if the movant can show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

The moving party has the initial burden to submit evidence demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Material facts are those which may affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable factfinder to return a verdict for the nonmoving party.  *Id.*

If the movant meets its initial responsibility, the burden shifts to the nonmoving party to establish a genuine issue of material fact exists.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## B.    Montana's Wrongful Discharge Statute

Smith's claim against Charter arises under Montana's Wrongful Discharge from Employment Act ("WDEA"), which states in pertinent part:

(1) A discharge is wrongful only if:

> (a) it was in retaliation for the employee's refusal to violate public policy or for reporting a violation of public policy;

> (b) the discharge was not for good cause and the employee had completed the employer's probationary period of employment; or

> (c) the employer violated the express provisions of its own written personnel policy.

Mont. Code Ann. § 39-2-904.  Here, Smith alleges his discharge was wrongful for lack of good cause under -904(1)(b).[2]

The WDEA defines "good cause" as "reasonable job-related grounds for dismissal based on a failure to satisfactorily perform job duties, disruption of the employer's operation, or other legitimate business reason."  Mont. Code Ann. § 39-2-903(5).  A legitimate business reason is one that is "neither false, whimsical, arbitrary or capricious, and … must have some logical relationship to the needs of the business."  *Putnam v. Cent. Montana Med. Ctr.*, --- P.3d ---, 2020 WL 1433423, *3 (Mont. 2020) (citing *Bird v. Cascade Cnty.*, 386 P.3d 602, 605 (Mont. 2015) (internal citations omitted)).  A court may not substitute its judgment for an employer's discretion in employment matters: "[i]t is inappropriate for courts to become involved in the day-to-day employment decisions of a business." *McConkey v. Flathead Elec. Corp.*, 125 P.3d 1121, 1126 (Mont. 2005).  Further, an employer's discretion is at its greatest when an employee occupies a sensitive managerial position and exercises broad discretion in their duties.  *Putnam*, 2020 WL 1433423, *3 (citing *Sullivan v. Cont'l Constr. of Mont., LLC*, 299 P.3d 832, 835 (Mont. 2013)).  Nevertheless, the Montana Supreme Court has clarified that:

---

[2] In his Complaint, Smith also states a claim under § 39-2-904(1)(c) that Charter violated its own personnel policy, and Charter moved for summary judgment as to that claim.  (*See* Doc. 40 at 14-15.)  In his response, however, Smith withdrew his -904(1)(c) claim.  (*See* Doc. 43 at 22, FN 1.)  Accordingly, summary judgment will be granted in favor of Charter as to Smith's personnel policy claim.

> An employer's legitimate right to exercise discretion over whom it will employ must be balanced [] against the employee's equally legitimate right to secure employment.  The balance should favor an employee who presents evidence, and not mere speculation or denial, upon which a jury could determine that the reasons given for his termination were false, arbitrary or capricious, and unrelated to the needs of the business.

*Johnson v. Costco Wholesale*, 152 P.3d 727, 733 (Mont. 2007) (quoting *Kestell v. Heritage Health Care Corp.*, 858 P.2d 3, 8 (Mont. 1993)).

An employer must set forth evidence demonstrating good cause for the discharge, whereupon the burden shifts to the employee.  *Id.* at *4.  "To defeat a motion for summary judgment on the issue of good cause, the employee may either prove that the given reason for the discharge is not good cause in and of itself, or that the given reason is a pretext and not the honest reason for the discharge."  *Becker v. Rosebud Operating Services, Inc.*, 191 P.3d 435, 441 (Mont. 2008) (quotations omitted).

## III.   Discussion

As noted above, when Charter terminated Smith's employment, two specific reasons were given: (1) Smith permitted an employee to work outside his assigned position and perform unauthorized electrical work; and (2) Smith failed to meet his 50% travel requirement for the month of December 2017.  (*Id.*; *see* Doc. 41-25.)

Smith argues that questions of fact exist as to whether Charter possessed good cause to terminate him.  (Doc. 43 at 10.)  First, Smith asserts that the employee was not performing electrical work and was instructed along with all

staff on numerous occasions that it was prohibited.  (*Id.* at 8.)  Second, Smith

contends that substantial evidence shows there was no 50% travel requirement in

place during 2017, and points to Charter's policy handbook, which only required

quarterly visits to his sites.  (*Id.* at 8-9.)  Third, Smith asserts that the evidence

shows that Smith was terminated because of his Facebook post, constituting

pretext.  (*Id.* at 35.)  Last, Smith argues that prior work records, performance

evaluations, and corrective action reports referenced in Charter's arguments were

successfully resolved and not related to the two stated reasons for discharge, and

are thus irrelevant to the determination of "good cause."  (*Id.* at 9-10, 22-23, 29.)

Charter states that Smith was discharged "after years of documented

performance issues, pervasive morale issues in the area under his supervision, and

multiple specific and plain violations of Company policy in the months leading up

to his termination."  (Doc. 40 at 2.)  Charter reasons that "[t]he cumulative effect

of these deficiencies paint a clear picture: Mr. Smith was disengaged as a leader,

lacked control over his department, demonstrated poor judgment, and failed

despite multiple chances to effectively manage his employees."  (*Id.* at 2, 13.)

Thus, Charter advances Smith's entire work record as cumulative evidence of

"good cause" beyond the reasons set forth in his final corrective action report.  (*See*

Doc. 41-25.)

Smith objects to Charter's reliance on his work history outside of their stated reasons for termination to justify his discharge.  (Doc. 43 at 22-23.)

In general, "reasons for discharge other than those set forth in a discharge letter are irrelevant, and thus inadmissible," in wrongful discharge cases. *McConkey*, 125 P.3d at 1127.  Charter argues this rule does not apply because it only concerns Mont. Code Ann. § 39-2-801, the "blacklisting statute," and not the WDEA.  (Doc. 46 at 11-12.)  The Court disagrees.

In reviewing Montana Supreme Court caselaw, the court adopted the rule confining termination reasons to those stated in discharge letters from § 39-2-801 and applied it to straight-WDEA claims in *Galbreath v. Golden Sunlight Mines, Inc.*, 890 P.2d 382, 385 (Mont. 1995).  *Cf. Swanson v. St. John's Lutheran Hosp.*, 597 P.2d 702, 706-707 (Mont. 1979), with *Galbreath*, 890 P.2d at 385 (*see also* Weber, J., dissent); *McConkey*, 125 P.3d at 1127.  *Galbreath* lacked any claims under § 39-2-801 and yet the court still applied the rule limiting its analysis of good cause to stated reasons for termination.  *Galbreath*, 890 P.2d at 385. Nevertheless, additional evidence offered to substantiate the reasons already given in a termination letter is relevant and admissible.  *Jarvenpaa v. Glacier Elec. Co-op., Inc*, 970 P.2d 84, 90-91 (Mont. 1998).

11

Therefore, the Court will confine its determination of good cause to the reasons set forth in Smith's termination letter, together with any relevant evidence that may substantiate those reasons.

### A.   Permitting Unauthorized Electrical Work

The first stated reason for discharge in Smith's final corrective action report reads in full:

> On Thursday, 12/14/17, it was brought to leadership's attention that Duane Auge, ISP Engineer II has not been working in his role as assigned to him in 8/2013.  Duane has been working as an Electrician in the Mountain states under your direction.
>
> - Resistance to following Playbook Standards and ISP Business Rules by knowingly allowing Duane Auge to continue performing as a management Area Critical Infrastructure Engineer after his position was changed to an ISP II Engineer.

(Doc. 41-25.)

Charter alleges that it adopted a policy which prohibited its employees from performing electrical work, and argues that an employee under Smith's supervision, Duane Auge, performed unauthorized electrical work.  (Docs. 40 at 13; 46 at 10.)  Charter asserts that it "discovered Mr. Auge, an engineer reporting to Mr. Smith, had for years been performing unauthorized electrical work" in violation of Charter policy.  (Doc. 40 at 13) (emphasis original.)  In support, Charter proffers an email from Auge to Smith and Auge's manager, Walt Jones, to show Auge "had always performed electrical work for Charter."  (*Id.*; Docs. 41-20;

41-21 at 3; 44 at ¶ 32.)  Charter also proffers Smith and Jones' depositions in support.  (Doc. 44 at ¶¶ 32-33, 35-36.)

Smith disagrees that Auge was performing electrical work, and specifically disagrees that Auge's email established that he had always performed electrical work, as alleged by Charter.  (Doc. 44 at ¶ 32.)  Smith further argues that his and Jones's depositions actually contradict Charter's contention that Auge was performing electrical work at any time after Smith returned to ISP in 2016, resulting in a genuine issue of material fact.  (Docs. 43 at 27; 44 at ¶ 33.)  Smith also points to Jones' testimony that this policy was not put in place until sometime in 2017 or 2018, and there is no evidence Auge performed electrical work after the policy was implemented.

As the moving party, Charter has the initial burden to submit evidence demonstrating the absence of a genuine issue of material fact, and it has not done so.  *See Celotex*, 477 U.S. at 323.  In reviewing the parties' evidence, the Court concludes there are issues of fact as to whether Auge was performing unauthorized electrical work, and thus issues of fact as to whether this constituted good cause for Smith's termination.  (Doc. 42 at 22-23.)

First, Charter's reliance on Auge's email as proof that he "had always performed electrical work for charter" is unavailing.  Auge had been an employee of Charter and its predecessor since 2013, and his email outlines his apparent

dissatisfaction with his assignment to a new position as a "headend tech."  In the email, Auge states that "I was hired as an electrician," and he outlines certain "perks" he had "[a]s an electrician for this company."  (Doc. 41-20 at 2.)  The email also expresses Auge's concerns with being "on call" in context of his past and current positions versus the proposed new position, and with his job duty changes and his qualifications.  (*Id.*)

It should first be noted that the varying content of the email itself disputes Charter's final corrective action report holding Smith accountable for Auge, who "has not been working in his role as assigned to him in 8/2013."  (*Cf.* Docs. 41-20 and 41-25.)  Clearly, Auge has not held the same position or title since August 2013.  He held multiple positions, and was unhappy with Charter's view of his "on call" responsibilities as he changed from an electrician, to Critical Infrastructure Engineer, to ISP Engineer, to headend tech.  (*See* Doc. 41-20.)

Additionally, the fact that Auge styles himself as an "electrician," or that he was originally hired as an electrician, falls far short of demonstrating that he was actually performing the unauthorized work of an electrician during the relevant time period, much less that he was doing it with Smith's authorization.  The manner in which Auge perceives his trade is not the same as the actual tasks he performed during a specific period of time when a specific policy limiting electrical work was in place.  Smith, for his part, forwarded Auge's email to

Stephanie Gainous and Gary Heimstead, suggesting that Auge "has said a few things which are very troubling." (*Id.* at 1.) What is "troubling," however, is unclear. Is it that Auge styled himself an electrician; that he felt unqualified; or that he refuses to work nights and be on call? The email lacks clarity, as Auge discusses multiple topics, positions, and tasks.

Second, Charter relies on Smith's deposition testimony that unauthorized electrical work was "dangerous" and "a liability for the company"; that Smith was surprised at Auge's level of discomfort as an ISP Engineer; and that Smith was ultimately responsible for his market area. (Docs. 40 at 13; 41-25; 44 at ¶¶ 33, 36.) But none of this testimony supports Charter's position that Auge was performing unauthorized electrical work, or that Smith knew Auge was doing so. (*Id.*) Indeed, Smith explained in his deposition the difference between a critical service engineer and a highend tech – the former was involved with overseeing and reviewing electric work, while the latter "wire RF equipment … phone lines to modems … low-voltage Ethernet stuff." (Doc. 44-4 at 67-68.) Drawing inferences in the non-moving party's favor, a juror could find that Auge's use of the title "electrician" was a generic trade reference despite his title/position changing over time, because he still worked with electricity, either through oversight or wiring "low-voltage Ethernet stuff."

Third, Charter's reliance on Jones's deposition only creates more ambiguity. Charter cites to Jones's deposition as "describing the electrical work that Mr. Auge reported performing at Charter."  (Doc. 44 at ¶ 32.)  In reviewing Charter's citation in full, however, Jones appears to be describing Auge's responsibilities.  (Doc. 41-21 at 4-5.)  But like Auge's email, there is no clear timeline that clarifies Auge's positions and responsibilities in context of Smith's management or alleged knowledge of Auge's alleged unauthorized electrical work.  (*Id*.)

Smith proffers a fuller version of Jones's deposition, which shows Auge's job duties excluded electrical work at the time he was moved to a headend engineer position in the "2017 slash '18 … time frame," around the time Auge wrote his December 2017 email.  (Doc. 44-5 at 8, ¶¶ 2-11.)  Jones testifies that he couldn't recall the specific date when the policy to have vendors perform electrical work was implemented, but that it was in the "2017/2018 time frame."  (*Id.* at 4, ¶¶ 13-17.)  Without evidence establishing that a policy barring electrical work was in place at the specific time that Auge performed specifically-identified electrical work with Smith's knowledge, factual issues remain regarding when Auge's positions changed; when the policy in question was implemented; Auge's performance of unauthorized electrical duties after policy implementation; and Smith's knowledge of Auge's performance of unauthorized electrical work.

Therefore, a jury could determine that the reason given for Smith's termination was false, arbitrary or capricious, and unrelated to the needs of the business.  Accordingly, the Court finds there are genuine issues of material fact regarding whether Charter had good cause to terminate Smith for "knowingly allowing Duane Auge to continue performing as a management Area Critical Infrastructure Engineer after his position was changed to an ISP II Engineer."

### B.    Travel Requirements

The second stated reason for discharge in Smith's final corrective action report reads, in pertinent part:

> In December 2017, you failed to fulfill the 50% travel requirement to your management area. You completed 5% travel. Dan did not inform Gary Heimstead, Regional VP, ISP, of any reason he was not able to fulfill this requirement.

(Doc. 41-25 at 1.)

Charter argues that Smith failed to travel 50% of the time, which was "an express job requirement" repeatedly communicated to him.  (Doc. 40 at 12.)  Smith responds that there was no 50% travel requirement in December 2017.  (Docs. 43 at 23; 44 at ¶ 37.)

In support of its position, Charter proffers the deposition testimony of Gary Heimstead and Thomas Gaebel.  (Docs. 41-7 & 41-8.)  Heimstead, Smith's supervisor, testified that there was a company directive which required 50 percent travel for himself and Smith starting "around February of 2017."  (Doc. 41-7 at 4,

7-8.)  Heimstead couldn't remember if the requirement was announced in an email but testified that it "came up" in a meeting in February 2017.  (*Id.* at 7-8.)  Gaebel, Heimstead's supervisor, testified that a high degree of travel was required for a leadership presence in the field "at around 50 percent as a target to achieve."  (Doc. 41-8 at 5, 9.)  But Gaebel's testimony does not identify to whom the requirement applied, or when this requirement was announced or implemented.  (*Id.* at 9, 10.)

In support of Heimstead and Gaebel's testimony, Charter also points to Smith's "2017 Performance Review," which states a "[n]eed to get in front of employees more" and "spend more time in the field and meet face to face with the people."  (Docs. 41 at ¶ 40; 41-10 at 6, 7.)

Charter also relies on the declaration Stephanie Gainous of Charter human resources, which states that she spoke with Smith over the telephone before he returned to work after his injury regarding any accommodations he may need upon his return.  (Doc. 41-35 at ¶ 8.)  "Specifically, I wanted to confirm that he was able to travel at least 50% of the time, which was a requirement of the role of a VP, ISP."  (*Id.*)  Gainous declares that Smith told her he was "able to travel 50% of the time, and that the only accommodation he needed was to be able to stop and stretch from time to time."  (*Id.*)

Charter also proffers a follow-up email chain between Gainous and Heimstead (and others), regarding Gainous's phone call with Smith.  (Doc. 41-23.)

18

In the most recent email of the chain, Gainous represents to Heimstead that Smith said, "he is able to drive 50% of the time to visit his sites." (*Id.* at 1.) The preceding email from Heimstead to Gainous questions whether Smith can drive, explaining: "He's required to do site visits 50% of the time. If he can do that, I'm fine, if not he can't perform his job functions…" (*Id.*)

Finally, Charter asserts that Smith's travel requirement was set forth in his ADA Job Description and Essential Functions form. (Docs 40 at 12; 41 at ¶ 40.) The form included a "physical demands" requirement that Smith be able to drive "frequently," which is defined as 46-100%. (Doc. 41-9 at 3.)

While some of Charter's proffered evidence is probative of a policy to encourage Charter management to travel to sites under their responsibility, none establishes an absence of material fact as to the specific requirements of Charter's travel policy.

First, Charter's reliance on the ADA – Job Description and Essential Functions form is entirely unpersuasive. In reviewing the form, neither the "position summary" nor the "essential duties and responsibilities" identifies a travel requirement. (Doc. 41-9 at 1.) "Driving (for work)" is itemized under the sub-section "Physical Demands," and provides that an employee must be capable of driving 46-100% of the time. (*Id.* at 3.) But the form also includes other functions that Smith must be capable of performing, including the ability to read,

19

see, sit, stand, walk, and type 46-100%.  (*Id.*)  Obviously, an employee would not be able to simultaneously perform each of these functions 46-100% of the time. The form plainly does not purport to require that Smith actually perform all of the listed functions for the percentages of time indicated, it simply requires that he be capable of performing the functions for that duration if required to do so.  (See *Id.* at 5, endnote.)  The Court finds that Smith's position could physically demand that he drive between 46 and 100%, nothing more.

With respect to the 2017 Performance Review and the Gainous-Heimstead email chain, the documents may provide evidence that Charter can rely upon to support its position at trial, but they fall far short of establishing the absence of genuine issues of material fact regarding Charter's travel requirement.  The Performance Review, for example, undoubtedly encourages Smith to travel more, get out into the field, and meet face to face with his employees.  (Doc. 41-10 at 6-7.)  But it does not establish or reference a specific travel requirement.  (*Id.*)

In addition, the Gainous-Heimstead email chain must be read in context. The subject line of the first email reads, "Charles D. Smith /dsmith 19 – ACTION REQUIRED: Americans with Disabilities Act (ADA) Accommodation Needed," and originates from a job accommodation specialist from Sedgwick Claims Management Services, an external party.  (Doc. 41-23 at 2.)  Gainous and Heimstead then discuss Smith's capacity to return to work, possible

20

accommodations, whether Smith can drive, and Heimstead refers to Smith's travel requirement.  (*Id.* at 1.)  In short, the email exchange appears to be a discussion of whether Smith could perform the essential functions of his position as outlined in his ADA job description, or whether an accommodation was required under the ADA.

While this evidence may be used to support Charter's claim of the existence of an individual travel requirement, Smith responds with evidence that tends to negate Charter's alleged 50% requirement.  Smith points to Charter's "ISP Playbook," which he contends governed the job requirements for ISP employees. (Docs. 43 at 23; 44 at ¶ 37.)  The ISP Playbook in effect for 2017 only required site visits quarterly for Smith's position: "Sr Dir/VP – Quarterly."  (Doc. 45-1 at 64.) The 2018 ISP Playbook, dated January 1, 2018, on the other hand, lists the requirement as: "SR Dir/VP – Quarterly, 50% overall travel requirement."  (Doc. 45-2 at 73.)  Thus, the 2018 Playbook was expressly amended to provide for a 50% travel requirement.  The stated reason for Smith's termination relating to travel, however, is confined to December 2017, when the 50% travel policy had yet to take effect.  (*See* Doc. 41-25.)

Smith also points to his January 5, 2018 individual development plan to further to show he was not subject to the 50% travel requirement.  (*Id.* at 24; 44 at ¶ 37.)  Similar to the ISP Playbook, Smith's individual development plan with

Charter included the "Action Step" that Smith "[v]isit each site at the beginning of the quarter with the Manager and ISP Engineer(s) in charge." (Doc. 44-2 at 2.)

Given this evidence, a reasonable juror could find that Smith was justified in concluding that he was only responsible to make quarterly visits to remote sites. After all, the Playbook and the development plan appear to be written declarations of Charter's policy and establish the requirements of Smith's position. (*See* Docs. 41-10 at 6-7; 41-23.) While it cannot be disputed that Charter wanted Smith to travel more, Charter's argument that Smith was under an "express job requirement" to travel 50% of the time is simply not supported by the company's own materials.

Therefore, the Court finds that genuine issues of material fact exist as to whether there was a 50% travel requirement for Smith in December 2017, and thus whether Charter had good cause for his termination on that basis.

## C.      Low Morale and Prior Work History

The Court recognizes that Charter makes other arguments related to low morale in Smith's region and his prior work history. (Docs. 40 at 11-12; 41 at ¶¶ 8, 20, 44-45.) The Court need not consider these assertions outside of whether they substantiate the two stated reasons for termination.

Charter attempts to tie low morale to the absence of a leadership presence by Smith, asserting that "many employees reported that they had not seen him on site

22

for months."  (Doc. 40 at 12.)  In support, Charter advances the testimony of

Thomas Gaebel and the declaration of Stephanie Gainous.  (*Id.*; Doc. 41 at ¶¶ 44-

45.)  In reviewing Gaebel's testimony, however, nothing ties morale issues in the

Mountain West Region to Smith or his lack of travel.  (Doc. 41-8 at 11-12.)

Gainous's declaration relates that she met with 12 Charter employees in the

Mountain states region on December 12-14, 2017 to investigate complaints of low

morale.  (Doc. 41-35 at ¶ 11; 41-33.)  The investigation may have some probative

value in support of Charter's claim that Smith needed to travel more, but it does

not support Charter's position that Smith was subject to a 50% travel requirement.

Gainous's investigation largely uncovered that employees do not like working for

Charter compared to their former company, Bresnan, but also noted other

concerns,  including that certain employees wanted to see more of management.

(Doc. 41-33 at 3-5.)  More specifically, Gainous notes that "[a] couple [of

employees] said they haven't seen [Dan Smith and Gary Heimstead] in 7-8

months, but 'maybe they are coming out to see us.'"  (*Id.* at 3, ¶ 1.)  Another note

addresses a lack of communication.  (*Id.* at 4, ¶ 6.)  Gainous also notes the lack of

team meetings and a desire among employees to meet once a month.  (*Id.*)

Therefore, Gainous's investigation revealed low morale in general and a lack

of communication on different levels, which may suggest that Smith needed to

travel more.  But the investigation sheds no light on any specific travel requirement

23

that Smith was required to comply with.  The Court thus finds that Charter's low morale does not substantiate Charter's assertion of good cause to terminate Smith for failing to meet a specific 50% travel requirement.

Charter's reliance on Smith's prior work history is similarly attenuated. Smith's final corrective action report lists two prior corrective actions: the April 6, 2017 Written Warning – Performance Policy Violations; and the October 30, 2017 Final Warning – Code of Conduction violations and Online Public Communications Policy violation.  (Doc. 41-25.)  In reviewing the April 6 Corrective Action Report, no references can be found relating to the reasons stated for Smith's termination.  (Doc. 41-11)  Indeed, the stated reason for the written warning relates to ISP response time and service restoration, availability of ISP sparing tools, and other technical issues and processes.  (*Id.*)  As Smith argues, Heimstead testified that Smith successfully resolved these issues and Smith's subsequent performance review noted improvement.  (Docs. 41-1; 41-10 at 7; 43 at 31; 44 at ¶ 20; 44-6 at 12.)  The October written warning related to Smith's Facebook post, which may be probative of Smith's indifference towards Charter's social media policy, does not substantiate either of the stated reasons for termination.  (Doc. 41-19.)

Therefore, the Court finds that neither low morale nor prior written warnings are relevant to the determination of whether Charter's stated reasons for terminating Smith constitute good cause.

## IV.    Conclusion

Based on the foregoing findings, **IT IS RECOMMENDED** that Charter's Motion for Summary Judgment be **GRANTED** with respect Smith's claim under Mont. Code Ann. § 39-2-903(1)(c) that Charter violated its own written personnel policy and **DENIED** in all other respects.

**NOW, THEREFORE, IT IS ORDERED** that the Clerk shall serve a copy of the Findings and Recommendation of United States Magistrate Judge upon the parties.  The parties are advised that pursuant to 28 U.S.C. § 636, any objections to the findings and recommendation must be filed with the Clerk of Court and copies served on opposing counsel within fourteen (14) days after entry hereof, or objection is waived.  D. Mont. Local Rule 72.3.

**IT IS ORDERED**.

DATED this 19th day of June, 2020.

_____
TIMOTHY J. CAVAN
United States Magistrate Judge