IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| CHARLES DANIEL SMITH, | CV 18-69-BLG-SPW |
| Plaintiff, | |
| vs. | ORDER ON MOTION IN LIMINE |
| CHARTER COMMUNICATIONS, INC., | |
| Defendant. | |

Before the Court is Plaintiff's Charles Daniel Smith's ("Smith") Motion In Limine. (Doc. 71). Smith requests an order excluding evidence and testimony in seven areas. (Doc. 72). The Court will address each area in turn.

## I. Factual Background

In 2012, Smith was employed by Cablevision Systems Corporation as the regional vice president of network management. (Doc. 44 at ¶ 1). Charter acquired Cablevision in July 2013, and as a result Smith became Charter's employee. (*Id.* at ¶ 2).

In May 2016, Smith changed positions to vice president of ISP (Inside Plant), responsible for the Mountain States management area, which included Montana, Wyoming, and portions of Colorado. (*Id.* at ¶ 12; Doc. 12 at ¶ 4). Smith was

employed at Charter's location in Billings, Montana. (Doc. 6 at ¶ 3).  In July 2017, Smith took time off for a church mission trip to Honduras to help disabled and disadvantaged children and mothers. (Doc. 44-4 at 45-46).  The trip was intended to be for two weeks, but Smith was injured and required 10 days of hospitalization in Honduras. (*Id*).  After a life flight to Miami, Smith spent another 14 days in the hospital. (*Id*. at 45).  Smith's time away from work was classified as leave under the Family and Medical Leave Act ("FMLA"). (*Id*. at 46–47).

Smith returned to work on November 20, 2017, but was terminated on January 29, 2018. (*Id*. at ¶¶ 30, 49).  A corrective action report ("CAR") (hereinafter "Termination Letter") identified two reasons for termination: (1) "knowingly allowing Duane Auge to continue performing as a management Area Critical Infrastructure Engineer after his position was changed to an ISP II Engineer"; and (2) "[i]n December 2017, you failed to fulfill the 50% travel requirement to your management area." (Doc. 41-25 at 1).

## II.  Procedural Background

Smith filed a claim for wrongful discharge under the Wrongful Discharge from Employment Act ("WDEA") in the Montana Thirteenth Judicial District Court in Yellowstone County in March 2018. (Doc. 1).  Charter removed the action to federal court in April 2018. (*Id*).  Following discovery Charter moved for summary judgment. (Doc. 39).

Judge Cavan issued a recommendation finding genuine issues of material fact as to whether Charter allowed unauthorized electrical work as to Duane Auge, and whether a 50% travel requirement existed in December 2017. (Doc. 48). This Court reviewed Judge Cavan's findings and determined that the dispute over the 50% travel requirement was "immaterial" because Charter presented enough evidence to establish "good cause" for the termination. (Doc. 51 at 10). Specifically, the undisputed evidence established that Smith failed to comply with the quarterly traveling requirement that both parties agreed existed. (*Id.*). This Court granted summary judgment based on Smith's failure to adhere to the quarterly traveling requirement. (*Id.* at 11).

Smith appealed this order to the Ninth Circuit. *Smith v. Charter Comms. Inc.*, 22 F.4th 1134. (9th Cir. 2022). The Ninth Circuit opined that if the sole question was whether Charter had "good cause" then this Court properly granted summary judgment. *Id.* at 1138. But, if the *Galbreath* rule remains good law, then genuine issues of material fact remained, and summary judgment was not proper. *Id.* In *Galbreath v. Golden Sunlight Mines, Inc.,* the Montana Supreme Court held that an employer may only defend its termination decision for the reasons stated in a discharge letter. 270 Mont. 19, 21, 890 P.2d 382, 384–85 (1995).

The Ninth Circuit then turned to the "key legal question in this case," whether the *Galbreath* rule remained good law following the Montana Legislature's 1999

statutory amendments. *Smith,* 22 F.4th at 1139. In 1999, the Montana legislature amended Mont. Code Ann. § 39-2-801 to provide that "a response to the demand may be modified at any time and may not limit a person's ability to present a full defense in any action brought by the discharged employee." *Id.* at 1140. According to the Ninth Circuit, this amendment meant that the employer is no longer bound in litigation by the reasons given in a termination letter. *Id.* Montana Courts have split following the 1999 amendments on whether the *Galbreath* rule still applied. *Id.* at 1140–41. To resolve this split, the Ninth Circuit certified the following question to the Montana Supreme Court: "Whether, in an action for wrongful discharge pursuant to Montana Code Annotated section 39-2-904, an employer may defend a termination solely for the reasons given in a discharge letter, as the court held in *Galbreath v. Golden Sunlight Mines, Inc.,* 270 Mont. 19, 890 P.2d 382 (1995), or whether the 1999 statutory amendments have superseded the *Galbreath* rule." *Id.* at 1141.

The Montana Supreme Court found that because the *Galbreath* rule is an evidentiary rule predicated on the Montana Rules of Evidence, it was not superseded by the 1999 amendments. *Smith v. Charter Comms. Inc.,* 2023 MT 92, ¶ 24, 412 Mont. 292, 529 P.3d 871. Therefore, employers are precluded from admitting irrelevant evidence of collateral reasons for discharge outside the termination letter. *Id.* However, employers may offer evidence to substantiate the reasons already

4

given in a termination letter. *Id.* Ultimately, the Montana Supreme Court found that Charter can defeat a wrongful discharge action only for the reasons given in a discharge letter, and genuine issues of material fact existed as to the reasons given in Smith's Termination Letter. Summary judgment was reversed, and the matter was remanded to the district court for further proceedings. (Doc. 60 at 5).

## III.   Analysis

Smith now moves to exclude various evidence Charter plans on introducing at trial including: (1) any evidence or argument related to Smith's future earning potential; (2) any evidence or argument related to the contingency fee agreement between Smith and his counsel; (3) the testimony of Charter's expert witness, Mr. O'Bryan; (4) any evidence related to Smith's failure to mitigate damages; (5) any evidence or argument related to Smith's termination other than those set forth in the Termination Letter; (6) any evidence related to the potential adverse impact of the litigation on Charter; and (7) any evidence related to settlement negotiations. (Doc. 72).

Charter does not oppose excluding evidence related to the contingency fee agreement and the settlement negotiations. (Doc. 79 at 7). Further, they agreed to exclude any evidence of the potential adverse impact on Charter if Smith agrees not to seek punitive damages. (*Id.*). In his reply, Smith indicated that he will not seek a claim for punitive damages. (Doc. 80 at 15). Therefore, Smith's motion in limine

to exclude any evidence related to: (1) the contingency fee agreement; (2) settlement negotiations; and (3) the potential adverse impact on Charter is GRANTED. The Court will consider the remaining motions in limine in turn.

### A.    Future Earning Potential

Under the WDEA, "if an employer has committed a wrongful discharge, the employee may be awarded lost wages and fringe benefits for a period not to exceed 4 years from the date of discharge." Mont. Code Ann. § 39-2-905(1). "The employee's interim earnings, derived from any new kind, nature, or type of work, … that did not exist at the time of discharge, including amounts the employee could have earned with reasonable diligence from the work, hire, contractor status, or employment, must be deducted from the amount awarded for lost wages." *Id.* Smith was discharged on January 28, 2018; therefore the four-year mitigation window ends on January 29, 2022.

Smith moves to exclude any evidence related to his future earning potential. (Doc. 72 at 16). Smith argues that his "earning potential beyond the earnings he made during the operative four-year time frame following his termination is entirely irrelevant, highly prejudicial, and inadmissible pursuant to Fed. R. Evid. 401 and 403." (*Id.* at 17). In response, Charter does not dispute that the four-year mitigation window exists. (Doc. 79 at 9). However, they argue that evidence of Smith's future earning potential is relevant because it informed his financial choices during the

6

four-year mitigation window. (*Id.*). Smith and his wife purchased Berkshire Hathaway Home Services Real Estate ("Berkshire") in 2021. (Doc. 72 at 14). According to Charter, Smith made an informed choice to return to his prior career in real estate, and while it generated a low salary in the short-term, his decision "had huge upside and high profitability in the medium-to-long term, after the close of the four-year mitigation window." (Doc. 79 at 9–10).

This Court agrees with Smith, evidence related to Smith's earnings outside the four-year window is irrelevant and cannot be introduced. The career choices an individual makes will always affect their future earning potential. Allowing evidence about future earning potential based on an individual's choices during the operative mitigation window would render the statutory four-year limit pointless. Charter will still be permitted to ask Smith about his choices during the four-year window but cannot discuss his earning potential beyond January 29, 2022. Smith's motion in limine is therefore GRANTED.

### B.    *O'Bryan Expert Testimony*

Smith next moves to exclude Charter's vocational expert, Mr. O'Bryan's, testimony regarding mitigation of damages. Smith argues that O'Bryan is unqualified to give an expert opinion on the vocational opportunities available to Smith. (Doc. 72 at 23). According to Smith, "O'Bryan's opinions with regard to mitigation should be excluded on the basis that he is unqualified as a CPA to opine

7

on vocational opportunities for Smith." (*Id.*). Further, that O'Bryan's reliance on statistics from the Bureau of Labor and the Economic Research Institute makes his opinion unreliable. (*Id.* at 22–23).

In response, Charter argues that O'Bryan is qualified to give expert opinions related to vocational opportunities because he is a partner in the Financial Advisory Services practice of Resolution Economics, LLC, has 45 years of experience, and has testified at 29 different trials since May 2020. (Doc. 79 at 15). Further, that O'Bryan's reliance on Bureau of Labor Surveys and record data pertaining to unemployment durations for individuals is a perfectly dependable methodology. (*Id.* at 16).

Under Fed. R. Evid. 702, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Cholakyan v. Mercedes-Benz, USA, LLC*, 281 F.R.D. 534, 542 (C.D. Cal. 2012). Rule 702 is applied consistent with "the 'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to "opinion" testimony.'" *Daubert v. Merrell Dow*

*Pharmaceuticals, Inc.*, 509 U.S. 579, 588 (1993) (quoting *Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 169 (1988)). An expert witness—unlike other witnesses— "is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation," so long as the "expert's opinion [has] a reliable basis in the knowledge and experience of his discipline." *Id.* at 592; *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 148 (1999).

"Fed. R. Evid. 703 permits experts to rely on 'facts or data' as a basis for opinions, even when not themselves admissible, so long as they are of a type reasonably relied upon by experts in the relevant field." *Jerpe v. Aerospatiale,* 2007 WL 1394969, at *6 (E.D. Cal. May 10, 2007). "As long as he is applying his training and experience to the sources before him and reaching an independent judgment, there will typically be no . . . problem. The expert's opinion will be an original product that can be tested through cross-examination." *United States v. Gomez,* 725 F.3d 1121, 1129 (9th Cir. 2013) (quoting *United States v. Johnson,* 587 F. 3d 625, 635 (4th Cir. 2009). "As long as surveys are conducted according to accepted principles such evidence should ordinarily be found sufficiently reliable under *Daubert.* Unlike novel scientific theories, a jury should be able to determine whether asserted technical deficiencies undermine a survey's probative value." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1143 n. 8 (9th Cir. 1997).

This Court agrees with Charter that O'Bryan has sufficient qualifications to testify as an expert on vocational opportunities. Smith is still free to attack O'Bryan's credentials on cross-examination.

Moving to the reliability of his opinion, O'Bryan must show that he applied his training and experience to the data he relied on in forming his opinion. Based on O'Bryan's expert report the Court finds that he applied his expertise to the sources before him. For example, when determining Smith's ability to mitigate his damages via new employment, O'Bryan relied on labor market research from: (1) BLS Occupational Employment and Wage Statistics ("OEWS") and (2) the Economic Research institute. (Doc. 79-6 at 13). O'Bryan then limited his analysis to data related to Smith's occupational field for western and mountain states to align with Smith's area of responsibly at Charter and his desired locations. (*Id.*). O'Bryan has applied sufficient independent analysis, and his expert report is an "original product that can be tested through cross-examination." *See United States v. Gomez*, 725 F.3d 1121, 1129 (9th Cir. 2013). Smith is still free to attack O'Bryan's methodology via cross-examination, however Smith's Motion in Limine to exclude O'Bryan's expert testimony is DENIED.

C.    *Mitigation of Damages*

Smith moves to exclude any evidence or argument related to Smith's mitigation of damages. (Doc. 72 at 25). Smith argues that Charter failed to meet

their burden because they cannot demonstrate that there was a substantially similar job available to him in his locality, or that he did not use reasonable diligence in finding a comparable position. (*Id.*). According to Smith, O'Bryan, fails to demonstrate that there were any jobs available that were commensurate with Smith's position at Charter and within his locality. (*Id.* at 23). In response, Charter argues that this argument is not appropriate for a motion in limine because "the reasonableness of a plaintiff's efforts to mitigate is a question of fact for jury determination." (Doc. 79 at 10 (quoting *Jackson v. Shell Oil Co.*, 702 F.2d 197, 202 (9th Cir. 1983).

The burden of proving a failure to mitigate damages in an employment discrimination suit is on the defendant. *Kaplan v. Intern. Alliance of Theatrical, etc.*, 525 F.2d 1354, 1363 (9th Cir. 1975). To satisfy this burden, the defendant must establish that (1) there were suitable positions available which plaintiff could have discovered and was qualified for; and (2) that plaintiff failed to use reasonable care and diligence in seeking such a position. *Sias v. City Demonstration Agency*, 588 F.2d 692, 697 (9th Cir. 1978).

The Court agrees with Charter that a motion in limine is not the proper vehicle for excluding an affirmative defense. "A motion in limine is a procedural mechanism to limit in advance testimony or evidence in a particular area." *United States v. Heller*, 551 F.3d 1108, 1111 (9th Cir. 2009). A motion in limine is not the proper

11

vehicle for seeking a dispositive ruling on a claim, particularly after the deadline for filing such motions has passed. *See Dubner v. City & Cnty. of S.F.,* 266 F.3d 959, 968 (9th Cir. 2001). Here, the deadline for dispositive motions was December 5, 2019. (*See* Doc. 38). The proper procedural mechanism to exclude an affirmative defense would be through a motion to dismiss or a motion for summary judgment rather than a motion in limine. Therefore, Smith's motion in limine to exclude Charter's mitigation of damages defense and any evidence related to it is DENIED. This includes evidence related to: (1) Smith's efforts to find comparable employment; (2) Smith's use of his savings during the mitigation window; (3) Smith's inability to work during the mitigation window; and (4) Smith's decision to enter the real estate business.

D.    *Evidence or Argument that Smith was Terminated for Any Reason Outside Those Stated in the Discharge Letter*

According to Smith's Termination Letter he was fired because he: (1) "knowingly allow[ed] Duane Auge to continue performing as a management Area Critical Infrastructure Engineer after his position was changed to an ISP II Engineer"; and (2) "[i]n December 2017, [he] failed to fulfill the 50% travel requirement to [his] management area." (Doc. 41-25 at 1).

Smith moves to exclude any evidence or argument in support of Smith's termination that was not in the Termination Letter. (Doc. 72 at 26). According to

Smith, the Montana Supreme Court and Ninth Circuit were clear that any evidence or argument in support of job termination other than the reasons set forth in his Termination Letter must be excluded at trial. (*Id.*).

In response, Charter argues that they should be allowed to present complete evidence of the reasons for Smith's discharge. (Doc. 79 at 18). First, Charter argues that the *Galbreath* rule does not apply to federal diversity cases, and therefore they should be permitted to introduce any evidence that is relevant to Smith's dismissal. (*Id.* at 20). Next, Charter argues that there were more than two reasons for discharge in the Termination Letter. (*Id.*). Specifically, the Termination Letter included references to Smith's April 2017 warning for performance policy violations, and his October 2017 warning for a code of conduct violation, under the "Prior Corrective Action" section. (*Id.* at 21). Therefore, Charter should be permitted to introduce evidence related to the April 2017 and October 2017 incidents. (*Id.*). Last, Charter argues that Smith interprets the Montana Supreme Court holding too narrowly, and incidents not included in the Termination Letter are admissible because they substantiate the reasons given in the Termination Letter. (*Id.* at 22).

The Court will first address whether the *Galbreath* rule applies in a federal diversity action, then whether evidence listed under the prior corrective action section of Smith's Termination Letter is admissible, and last whether Charter's proposed evidence substantiates the reasons given in Smith's Termination Letter.

### 1. *Diversity Jurisdiction*

Generally, evidentiary rules are procedural in nature, and the Federal Rules of Evidence typically govern in diversity cases. *Wray v. Gregory*, 61 F.3d 1414, 1417 (9th Cir. 1995). However, the Federal Rules do not supplant all state law evidentiary rules with procedural ones. *Id.* "[W]here a state evidence rule is 'intimately bound up' with the rights and obligations being asserted, *Erie* mandates the application of a state rule in a diversity suit." *Id.* (quoting *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)). Some state law rules of evidence "in fact serve substantive state polices and are more properly rules of substantive law within the meaning of *Erie*. *Id.* (quoting 19 WRIGHT, MILLER & COOPER, FEDERAL PRACTICE AND PROCEDURE § 4512 (1984)).

Montana has established an integrated scheme for handling wrongful termination claims. The termination letter constitutes a key feature of the scheme. It would make little sense for federal courts to disregard Montana's carefully tailored rules regarding the use of evidence in WDEA claims. Therefore, the Court finds that the *Galbreath* rule, requiring courts to only consider the reasons listed in the termination letter, is a substantive rule that must be adhered to in federal diversity cases.

14

## 2.    *Prior Corrective Action Record*

In Smith's Termination Letter there is a "Reason for Corrective Action" section and "Prior Corrective Action Record" subsection. (Doc. 72-3). Under the Reasons for Corrective Action there are two incidents listed: (1) "knowingly allowing Duane Auge to continue performing as a management Area Critical Infrastructure Engineer after his position was changed to an ISP II Engineer" and (2) "[i]n December 2017, you failed to fulfill the 50% travel requirement to your management area." (Doc. 41-25 at 1). Under the Prior Corrective Action Record there are also two incidents listed: (1) "4/6/17 – Written Warning – Performance Policy Violations" and (2) "10/30/17 – Final Warning – Code of Conduct violations and Online Public Communications Policy violation." (*Id.*).

Charter argues that they should be permitted to present evidence related to the incidents listed under the Prior Corrective Action Record section of the Termination Letter. (Doc. 79 at 21). Charter contends that the final incidents leading to discharge were "the straw that broke the camel's back," and the Termination Letter memorialized this by referencing the April 2017 Warning and October 2017 Final Warning. (*Id.*). In response, Smith contends that Charter's argument is flawed because if Smith was terminated for his prior warnings, those warnings should have been listed in the "Reasons for Corrective Action" section. (Doc. 80 at 9).

The reasoning underlying the *Galbreath* Rule is the application of the Montana Rules of Evidence. *Smith*, ¶ 13. Rule 402 states that "all relevant evidence is admissible, except as otherwise provided by constitution, statute, these rules, or other rules applicable in the courts of this state. Evidence which is not relevant is not admissible." *Id.* Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Id.;* M. R. Evid. 401. In WDEA cases, the proffered reason an employer provides in a termination letter is the "fact of consequence" as to whether the employee was wrongfully discharged. *Id.* (citing *Galbreath*, 270 Mont. at 19, 890 P.2d at 385). The *Galbreath* Rule precludes admitting irrelevant evidence of collateral reasons for discharge other than the sole reason stated in the discharge letter, however evidence offered to substantiate the reasons already given in the discharge letter is admissible. *Id* at ¶ 24.

Based on a plain reading of the Termination Letter this Court finds that the incidents listed under the "Reasons for Corrective Action" are the facts of consequence in this matter. The Court agrees with Smith that if Charter wanted to substantiate Smith's firing based on the incidents in April 2017 and December 2017, they should have listed the incidents under the proper section. Therefore, Charter can only introduce evidence that relates to or substantiates Smith's failure to

properly supervise Duane Auge and his failure to fulfill the 50% travel requirement in December 2017.

### 3.    Evidence Substantiating Reasons for Discharge

Smith moves to exclude any evidence of prior unrelated write-ups and disciplinary actions that do not substantiate the reasons given in the Termination Letter. (Doc. 72 at 28). Specifically, Smith moves to exclude evidence related to: (1) Smith's failure to meet his quarterly site-visit requirement; (2) an October 8, 2015 corrective action report; (3) an April 6, 2017 corrective action report; (4) Smith's two week suspension in December 2017; (5) a December 2017 employee survey; (6) a March 2017 performance review; and (7) Emad Abou-Tabl's report of safety issues. (*Id.* at 28–29). In response, Charter contends that Smith reads the Montana Supreme Court decision too narrowly, and that evidence related to these incidents is admissible because it substantiates the reasons for discharge. (Doc. 79 at 22–23).

### a. Quarterly Site Visit Requirement

Smith argues that the Ninth Circuit has already determined that evidence related to the quarterly site-visit requirement is inadmissible in their remand letter. (Doc. 72 at 28). In their remand letter, the Ninth Circuit, wrote that "[Charter] may not justify the firing on the ground [that Smith] failed to meet a quarterly site-visit requirement, because that was not a reason specified in the corrective action report."

17

(*Id.* at 28–29 (quoting *Smith,* No. 21-35149 (9th Cir. July 24, 2023). In response, Charter argues that Smith omits key context from the Ninth Circuit. (Doc. 79 at 23). According to Charter, the Court was merely explaining why summary judgment was improper, not whether the evidence about quarterly site visits is actually admissible. (*Id.*). Rather, the Ninth Circuit indicated such evidence would be admissible if "it tends to show that [Charter] imposed a similar [traveling] requirement in December 2017." (*Id.* (quoting *Smith*, No. 21-35149)). Charter concludes that whether Smith failed to travel a quarter of the time substantiates whether a December travel requirement existed and is therefore relevant. *Id.* at 24.

This Court disagrees with Charter's interpretation of the Ninth Circuit's remand letter. The Ninth Circuit indicated that evidence of the quarterly site-visit requirement may be admissible if it demonstrates that a 50% travel requirement existed in December 2017. Not that Smith's failure to fulfill the requirement is an indication that a similar requirement existed in December 2017. These are two separate issues. The fact that Smith failed to meet his quarterly site visit requirements does not substantiate the fact that the travel requirement existed in December 2017. Therefore, Smith's motion to exclude evidence related to Smith's failure to fulfill the quarterly-site visit requirement is GRANTED.

### b. *October 2015 Corrective Action Report*

Smith moves to exclude any evidence related to the October 2015 corrective action report. (Doc. 72 at 28). In response, Charter argues that the October 2015 report substantiates the reasons for discharge listed in the Termination Letter. (Doc. 79 at 24). Specifically, the October 2015 report discusses Smith's failure to properly supervise Leon Hansen, and this substantiates the fact that Smith failed to properly supervise Duane Auge. (*Id.*).

Smith's failure to properly supervise an unrelated employee, does not substantiate the fact that he failed to supervise Duane Auge. The October 2015 report indicated concerns in several areas including, leadership, project execution, metrics, and communication. (Doc. 72 at 28). According to the October 2015 report, "ongoing issues with Leon Hansen's performance have not been addressed." (Doc. 72-4). In the Termination Letter, the reason for discharge related to Duane Auge was that Smith improperly allowed him to perform work as an electrician. (Doc. 72-3). The fact that Smith had communication issues with Hansen does not substantiate the fact that he allowed Duane Auge to perform unauthorized electrical work. These are two unrelated employment issues. Therefore, Smith's motion in limine to exclude evidence related to the October 2015 report is GRANTED.

### b. April 2017 Corrective Action Report

Smith moves to exclude evidence related to the April 2017 corrective action report. (Doc. 72 at 28). In response, Charter argues that the April report substantiates the reasons for discharge. (Doc. 79 at 24). Specifically, that the report substantiates Smith's failure to properly supervise Duane Auge because it indicates that Smith failed to properly supervise ISP responses. (*Id.*).

Like the October 2015 report, this Court finds that the April 2017 report does not substantiate the fact that Smith failed to properly supervise Duane Auge. According to the April 2017 report, Smith failed to "insure ISP response is immediate on several occasions." (Doc. 72-5). Smith's failure to properly supervise ISP responses does not substantiate that he allowed Duane Auge to perform unauthorized electrical work. Again, these are two unrelated employment issues. Therefore, Smith's motion in limine to exclude evidence related to the April 2017 report is GRANTED.

### c. October 2017 Suspension

Smith moves to exclude any evidence related to his two-week suspension in October 2017. (Doc. 72 at 29). In response, Charter argues that the October 2017 suspension substantiates their decision to terminate Smith because it demonstrates his ongoing policy violations. (Doc. 79 at 25).

In October 2017, Smith posted a comment on Facebook from his private account, which read: "Cut the Helena fat and stop playing games Governor. No program is going to make little disabled kids more intelligent. Cut the feel good nonsense and govern." (Doc. 44 at ¶ 24). Another Facebook participant took a screenshot of the post and shared it. (*Id.*). The shared post received public attention, resulting in complaints and media directed at Charter. (*Id.* at ¶ 25). As a result, Smith was suspended for two weeks without pay and given a final written warning in lieu of termination. (Doc. 41-35 at 3, ¶ 7).

Evidence that is admissible must relate to or substantiate the reasons listed in the employee's termination letter. It is unclear to the Court how Smith's suspension based on a social media post substantiates the reasons for termination. Smith's suspension does not relate to his supervision of Duane Auge or the December 2017 travel requirement. Therefore, Smith's motion in limine to exclude evidence related to Smith's suspension is GRANTED.

### d. December 2017 Employee Survey

Smith moves to exclude evidence related to an employee survey conducted in December 2017. (Doc. 72 at 29). Smith argues that even if the survey showed low morale and employment issues under his oversight, such evidence would be irrelevant to the reasons for Smith's discharge. (*Id.*). In response, Charter argues that the survey evidence demonstrates that Smith's failure to travel was a primary

21

cause of morale issues in his region.  (Doc. 79 at 25).  Further, that the Montana Supreme Court has considered "exactly the same situation" previously and found that survey evidence related to employee morale was admissible in a matter under the WDEA.  *Id.* (citing *Jarvenpaa v. Glacier Elec. Co-op., Inc.,* 292 Mont. 118, 970 P.2d 84 (1998).

Charter is mistaken when it says *Jarvenpaa* presented the exact situation as in the instant matter.  In *Jarvenpaa,* the termination letter indicated that Jarvenpaa detrimentally affected the morale and the operations of the workplace.  292 Mont. at 128, 970 P.2d at 90.  At trial, Glacier introduced testimony from employees that morale improved after Jarvenpaa retired.  *Id.* at 127, 920 P.2d at 90.  The Supreme Court of Montana found that the evidence was admissible because Glacier was offering evidence that substantiated the reasons given in its termination letter.  *Id.* at 128, 920 P.2d at 91.  In the instant matter there is nothing under the Reasons for Corrective Action section of the Termination Letter that discusses employee morale.  Therefore, the December 2017 survey does not substantiate the reasons listed in the Termination Letter.  Smith's motion in limine to exclude evidence related to the December 2017 survey is GRANTED.

### e.  March 2017 Performance

Smith moves to exclude any evidence related to his March 2017 performance review.  (Doc. 80 at 12).  In response, Charter argues that the review substantiates

reasons for his discharge because the review states that Smith needs to "spend more time in the field and meet face to face with people working for and with you." (Doc. 79). Evidence that is admissible must relate to or substantiate the reasons listed in the employee's termination letter. Again, it is unclear how this critique of Smith in a March 2017 review substantiates his failure to supervise Duane Auge or to fulfill his December travel requirement. Smith's motion in limine to exclude evidence related to the March 2017 performance review is GRANTED.

### f. Emad Abou-Tabl Report

Last, Smith moves to exclude any evidence related to a report of safety issues from Emad Abou-Tobl. (Doc. 72 at 30). In response, Charter argues that the evidence substantiates the reasons for discharge, because it demonstrates Smith's repeated policy violations. (Doc. 79 at 26). In 2017, Abou-Tabl reported safety issues at a Wyoming work site that Smith supervised. (*Id.*).

It is unclear to the Court how this incident substantiates the reasons given in the Termination Letter. Charter asserts that it demonstrates Smith's "repeated policy violations" which lead to his discharge. (*Id.*). However, the only "policy violations" that can be considered are the ones listed in the Termination Letter. Therefore, Smith's motion to exclude evidence of Abou-Tabl's report of safety issues is GRANTED.

## V. Conclusion

Accordingly, IT IS ORDERED that Plaintiff Smith's Motion in Limine (Doc. 71) is GRANTED IN PART and DENIED IN PART

1. The Motion in Limine is GRANTED as to Smith and his counsel's contingency fee agreement.

2. The Motion in Limine is GRANTED as to settlement negotiations between the parties.

3. The Motion in Limine is GRANTED as to the potential adverse impact litigation may have on Charter.

4. The Motion in Limine is GRANTED as to evidence of future earning potential outside the four-year statutory window.

5. The Motion in Limine is DENIED as to the admissibility of O'Bryan's testimony.

6. The Motion in Limine is DENIED as to evidence related to mitigation of damages.

7. The Motion in Limine is GRANTED as to evidence that Smith was terminated for reasons other than those listed in the Termination Letter.

DATED this _13th_ day of January, 2025.

Susan P. Watters

SUSAN P. WATTERS
United States District Judge

24